UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:15-CR-72-PPS-APR |
| | ) | |
| DARRICK ROBERT VALLODOLID, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>OPINION AND ORDER</u>**

In this racketeering prosecution, Darrick Vallodolid was convicted at trial for his involvement in the Latin Kings street gang. His participation in the gang included the murder of a 16 year old boy who was riding through the neighborhood on his bike when Vallodolid shot and killed him, thinking he was a rival gangster. Vallodolid was sentenced to life imprisonment. In this petition under section 2255, Vallodolid challenges his sentence on multiple grounds, including ineffective assistance of counsel. Vallodolid advances numerous arguments, but the most compelling is his claim that trial counsel failed to explain the likelihood of a life sentence if convicted at trial. I held an evidentiary hearing to explore this issue and others, and based upon the testimony of Vallodolid and his two trial lawyers, it is clear that his claims all fail. Vallodolid did not receive ineffective of counsel—far from it. And most of his other claims were either already decided by the Seventh Circuit or are procedurally defaulted. The motion will therefore be denied.

## Background

An eleven day jury trial was held before me in May 2018 against Vallodolid and his co-defendant, Robert Nieto. Vallodolid was found guilty of a RICO conspiracy in violation of 18 U.S.C. § 1962(d), and in answer to a special interrogatory, the jury unanimously found Vallodolid committed the murder of Victor Lusinski while committing or attempting to commit criminal gang activity; he was also convicted of a drug conspiracy involving more than 5 kilograms of cocaine. [DE 1590.] On November 25, 2019, I sentenced Vallodolid to a term of life imprisonment on Counts 1 and 2 of the fourth superseding indictment, to be served concurrently. [DE 2418.]

The evidence at trial showed that Vallodolid was a member of the Latin Kings, a Chicago-based street gang, with local sets or in Hammond, Gary, and East Chicago. [Tr. 372-75, 458-59, 497, 543, 1025, 1053-54.] The Latin Kings are a highly organized street gang with a written manifesto, a distinct hierarchy and established rules. The evidence established that members of the Latin Kings committed acts of violence including murders, shootings, arsons, beatings to protect their territory, and they were involved in an extensive drug trade. [Tr. 375-76, 450, 482, 511, 1040-41, 1053, 1065-66, 1092-93, 1143-46, 1159, 1440, 2109, 2276.] The Kings had a common gang sign (a five-point crown) and a unique handshake that they called "shaking up the crown." [Tr. 391-92, 437-39, 476-79, 1033-34, 1092, 1376-77, 1393.] The Latin Kings were required to pay dues which went to purchase drugs for resale, firearms, ammunition, and pay attorney fees and bond money for incarcerated members. [Tr. 491, 1345, 1418, 1673.]

2

Vallodolid rose in the ranks to the position of the Inca, which was the leader of one of the local sets.  [Tr. 463-69, 498, 501-03, 1040-41, 2260, 2269.]  Eight Kings testified against Vallodolid at trial, identifying him as an Inca of the Hammond 148th Street set of the Kings, and testifying that they saw him sell drugs, carry guns, post up and patrol his territory, collect and deliver gang dues, order and participate in beatings for rule violations and initiations into the gang, give orders for others to commit acts of violence, shoot at a house and a car, and shake up the crown.  [Tr. 531-35, 858-66, 1170-88, 1254-64, 1357-74, 1378-84, 1684-86, 1689-90, 1693, 1757, 1762-66, 2251-52, 2269, 2271-83, 2288-93.]

There was also evidence that Vallodolid shot and killed 16 year old Victor Lusinski believing him to be a rival gang member.  [Tr. 892-97, 894-95, 921-22, 927-28, 1387-88, 1390-95, 1557, 1568-70, 1769-72.]  The jury found in its answers to a special verdict form that the murder of Lusinski was done both with the intent to benefit the Latin Kings and to increase Vallodolid's standing in the Kings. [DE 1948 at 51-52; DE 1590].

Vallodolid was represented at trial and sentencing by attorneys James Vanzant and Jonathan Bedi.  After sentencing, counsel filed a motion for a new trial which I denied on the merits. [DE 1914, 1986.] Vallodolid appealed his conviction to the Seventh Circuit. [DE 2436.]  On March 28, 2022, the Seventh Circuit denied Vallodolid's appeal on all grounds and entered a final judgment and mandate against Vallodolid. [DE 3004; *United States v. Nieto*, 29 F.4th 859 (7th Cir. 2022).]  Vallodolid then filed a petition for writ of certiorari with the United States Supreme Court, which was denied on October

11, 2022. *Nieto v. United States*, 143 S.Ct. 344 (2022). Vallodolid had one-year from the date certiorari was denied to file his 2255 motion. 28 U.S.C. § 2255(f).

On August 7, 2023, Vallodolid filed an emergency motion asking the Court to order his prior attorneys to send him transcripts. [DE 3210.] Knowing that time was of the essence because Vallodolid's one-year period of time to file his section 2255 was rapidly passing, I granted this motion just three days later, ordering Attorney Bedi to place a copy of Vallodolid's trial transcripts in the mail that same day. [DE 3214.]

Vallodolid filed his motion to vacate under 28 U.S.C. section 2255 on November 1, 2023. [DE 3245.] That same day he filed a motion for an extension of time to file a memorandum in support, which I granted. [DE 3246, 3247.] In the order granting his motion for an extension of time to file the memorandum, I asked Vallodolid to first address the timeliness of his motion. [DE 3247.] In the 2255 motion, Vallodolid attested under penalty of perjury that he placed the 2255 motion in the prison mailing system on October 8, 2023. [DE 3245 at 12.] However, the enclosed envelope reads the motion was mailed via next day air on November 1, 2023 (significantly after Vallodolid said it was placed in the mail system). Also, confusingly, there was a cover letter included with the 2255 motion dated October 26, 2023 (significantly after October 8, 2023 when Vallodolid stated the motion was put in the mail system), and the letter states Vallodolid forwarded his section 2255 motion earlier in October, but because his family told him it had not been docketed yet, he was sending the filings again in case the original filings never

4

reached the court. [DE 3245-1 at 1.] For these reasons, I asked Vallodolid to address the issue of timeliness in his memorandum.

Valldolid then attached a Declaration to his memorandum in support, attempting to address the Court's issue with timeliness. There, he states "I placed my original 28 U.S.C. § 2255 Motion in the mail on October 8, 2023. After learning from my family, on or about October 26, 2023, that my 28 U.S.C. § 2255 Motion had not been docketed I had a duplicate copy of my filing sent to the Court via express courtier [sic.]." [DE 3253 at 22.] Vallodolid sought to supplement his section 2555 motion, and this court granted his request. [DE 3312, 3316.] Vallodolid's supplemental memorandum is found on the docket at DE 3302-1.

In its response, the government provides evidence that there is no record of Vallodolid sending a certified mailing to the Court prior to the October 11, 2023 due date. [DE 3324 at 4; Ex. 1.] The staff at FCC Beaumont only recorded a certified mail log. *Id.* The problem for the government is that Vallodolid was no longer being housed at FCC Beaumont; he had been transferred to FCC Butner. [DE 3352 at 2.] Indeed, the envelope from the original 2255 Motion reflects it was sent from FCC Butner. [DE 3245-2.] Vallodolid requested an evidentiary hearing in this matter. [DE 3253 at 16.] Given the confusion over when Vallodolid actually placed his 2255 motion in the prison mail, and the lack of corroborating evidence, I thought an evidentiary hearing would be prudent.

A short time before the hearing, Vallodolid's newly appointed 2255 counsel filed a supplemental memorandum of law regarding ineffective assistance of counsel during

plea negotiations. [DE 3513.] On January 9, 2026, I held an evidentiary hearing at which Vallodolid was present, along with his counsel. He testified, as did his trial attorneys Bedi and Vanzant. At that hearing, the government officially abandoned contesting the issue of timeliness. Instead, the parties focused on the merits of the motion, making the issue of effective assistance of counsel the focal point.

## Discussion

A petitioner seeking relief under §2255 faces a high hurdle. Indeed, such relief is only available "in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Harris v. United States*, 13 F.4th 623, 627 (7th Cir. 2021) (quoting *United States v. Coleman*, 763 F.3d 706, 708 (7th Cir. 2014)); *see also Coleman v. United States*, 79 F.4th 822, 826 (7th Cir. 2023) (describing relief under § 2255 as an "extraordinary remedy and therefore only available in limited circumstances"). In order to proceed on a habeas corpus petition pursuant to section 2255, a federal prisoner must show that the district court sentenced him in violation of the Constitution or laws of the United States, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996).

## I.    Claims Already Addressed by the Seventh Circuit

In his supplement to his section 2255 motion, Vallodolid claims his life sentence is unconstitutional and Indiana's murder statute was improperly applied in relation to his

RICO conviction. [DE 3302-1 at 2-4, 11-15.]  Both of these claims were addressed and rejected by the Seventh Circuit on appeal. [DE 3004-1 at 20-22.] "Issues that were raised on direct appeal may not be reconsidered on a § 2255 motion absent changed circumstances." *Varela v. United States*, 481 F.3d 932, 935 (7th Cir. 2007); *White v. United States*, 371 F.3d 900, 902 (7th Cir. 2004).

Vallodolid also argues that this Court incorrectly calculated his guideline sentencing range because this court improperly found an aggravating circumstance of intentionally killing the victim. [DE 3302-1 at 11-14.] But the Seventh Circuit already addressed this Court's guidelines calculation, and found it proper. [DE 3004-1 at 20-22.] In addition, now that the guidelines are no longer binding, the judge "must therefore independently determine the appropriate sentence in light of the factors set forth in 18 U.S.C. § 3553(a)," so such a claim is not cognizable under section 2255. *United States v. Coleman*, 763 F.3d 706, 708-09 (7th Cir. 2014).

## II.    Claims Procedurally Defaulted

Another claim made by Vallodolid is barred because he failed to assert it on direct appeal.  Vallodolid claims his conviction based on the RICO conspiracy should be vacated because it is not a crime of violence. [DE 3302-1 at 2.]

"A claim not raised on direct appeal generally may not be raised for the first time on collateral review and amounts to procedural default." *White v. United States*, 8 F.4th 547, 554 (7th Cir. 2021) (citing *McCoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016)); *see also Delatorre v. United States*, 847 F.3d 837, 843 (7th Cir. 2017) ("Any claim that could

have been raised originally in the trial court and then on direct appeal that is raised for the first time on collateral review is procedurally defaulted.").  If a petitioner has procedurally defaulted on a claim, he needs to show cause and prejudice, or a miscarriage of justice before he can raise the claim on collateral review.  *Cross v. United States*, 892 F.3d 288, 294-95 (7th Cir. 2018).  "To excuse a procedural default for cause and prejudice, a petitioner must demonstrate both (1) good cause for his failure to raise the defaulted claim before collateral review and (2) actual prejudice stemming from the violations alleged in the defaulted claim."  *Delatorre*, 847 F.4th at 843.  Alternatively, a showing of fundamental miscarriage of justice is a high bar that requires a showing of actual innocence.  *White*, 8 F.4th at 557.  Vallodolid has made none of these showings in relation to his claim that RICO conspiracy—and one involving a murder, no less—is not a crime of violence.  Because it is procedurally defaulted, I can set this claim aside.

### III.    Ineffective Assistance of Counsel Claims

The remainder of Vallodolid's arguments fall under the rubric of ineffective assistance of counsel.  Vallodolid claims that his trial counsel provided ineffective assistance of counsel for a number of reasons.  Any ineffective assistance of counsel claim is governed by *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland,* to prevail, Vallodolid must first show the specific acts or omissions of his attorney "fell below an objective standard of reasonableness" and were "outside the wide range of professionally competent assistance" and second, he must show prejudice, which entails showing by "a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 690, 694; *see also Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993). If a petitioner cannot establish one of the *Strickland* prongs, the Court need not consider the other. *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014). The court's "scrutiny of counsel's performance is highly deferential" and a defendant must overcome the strong presumption "that counsel's conduct falls within the wide range of reasonable professional assistance." *Christopher v. United States,* 148 F.4th 885, 890 (7th Cir. 2025) (citations omitted).

### A.      Representation During the Plea Phase

The main argument advanced by Vallodolid, and concentrated on during the evidentiary hearing, is his claim that his trial counsel was ineffective in plea negotiations. Although Vallodolid proceeded to trial, was found guilty, and sentenced to two life sentences, he was involved in significant plea discussions with the government prior to trial. According to Valldolid's testimony during the beginning of the hearing, his trial counsel Vanzant advised him that he would get no more than 30 years in prison if he lost at trial, so he thought he was risking nothing to go to trial.[1] He also claimed that Vanzant showed him a chart which showed that under Guideline 2A1.1 for murder, criminal history category three, in 2016 the average sentence was 273 months nationwide, and the median was 240 months. [Hrg., Def. Ex. B.] According to

---

[1] A transcript of the hearing was not requested by the parties or created. Therefore, I am relying on my memory and notes when recounting the testimony given at the evidentiary hearing.

9

Vallodolid, his trial counsel told him to "chill," he wouldn't get more than 30 years imprisonment.

This claim deserves detailed consideration. A review of the time line, and the plea agreements offered by the government, is essential. I'll start with Vallodolid's hearing testimony, and what he believes occurred, and will subsequently address the testimony of Attorneys Bedi and Vanzant. The first plea agreement offered by the government to Vallodolid when only the second superseding indictment was pending, in 2016 or 2017, contained a 240 month imprisonment cap, but required that Vallodolid cooperate with the government (including testifying at any trials or judicial proceedings). [Hrg., Def. Ex. E.] This was prior to the government knowing about Vallodolid's role in the murder of Victor Lusinski. Vallodolid conceded during the hearing that he was not interested in cooperating with the government, and would not have agreed to this plea deal even if his attorneys had offered different advice.

The next tendered plea agreement was also offered by the government at the time the second superseding indictment was pending (so, again, prior to the murder enhancement being charged), and this plea also contained a 240 month imprisonment cap. Unlike the first plea that was offered, this version did not require cooperation. [Hrg., Def. Ex. F.] Vallodolid also did not agree to this plea.

The third proposed plea agreement offered by the government was made around March 2017, and had a 360 month imprisonment cap. [Hrg, Def. Ex. G.] Vallodolid testified that he did not accept this plea because it provided he would be responsible for

10

relevant conduct of the equivalent of at least 3.5 kilograms of cocaine, but less than 5 kilograms of cocaine. [*Id.* at 5.] Vallodolid thought it was sketchy that the government previously offered a 240 month cap, but then switched to 360 month cap, and he wanted the drug amount to be lower.  According to Vallodolid, he thought he would only get 30 years maximum if he were found guilty at trial.  However, Vallodolid did concede his attorneys told him if he went to trial, this would be like taking away his "safety net."

On April 5, 2017, Vallodolid wrote a letter to Vanzant regarding this third proposed plea agreement. [Hrg, Def. Ex. H.]  In the letter, Vallodolid talks about their meeting that day and "how we discussed a plea agreement." [*Id.* at 1.]  Vallodolid also mentions the drug amount and states "I'm far away from signing that plea agreement, I know you talked about how you may get the sentence lower but I can't take a chance with that, it's my life I will be signing away on the dotted line." [*Id.* at 1-2.]  He goes on to state, "if the prosecutor wants to make a deal then let's do it and not be trying to set me up for failure by signing a cap at 360 months, I would make a deal with the drugs being lower then what I'm getting charged with." [*Id.* at 2.] Vallodolid continues, "[a]t this point in the case I still see trial in the future but if you can talk to them and negotiate a reasonably [sic.] plea with a cap at 120 months and for the drugs to be reduced way lower then what they are now then I will sign no problem." *Id.*

On June 14, 2017, Vanzant wrote a letter to Vallodolid stating "[y]esterday the Government filed the enclosed notice, which states that the Government intends to introduce evidence at trial regarding the murder of Victor Lusinksi in 2009.  This adds a

11

new wrinkle to the case, so we will need to discuss this in detail when I next visit." [Hrg, Def. Ex. I; *see* notice at Def. Ex. J.]  In response, Vallodolid wrote Vanzant a letter on June 18, 2017, expressing his surprise and confusion about the notice of intent to introduce evidence regarding the shooting and killing of Victor Lusinski stating, "I was just about to tell you that I would consider a plea deal this coming visit between us but if the government is charging me with this crime that happened in 2009 then trial is the only thing I got in my mind." [Hrg, Def. Ex. K.]

At first, Vallodolid claims they were going to try a "withdrawal defense" by getting other gang members in jail to sign an affidavit saying Vallodolid had withdrawn from the conspiracy.  Vallodolid thought this was a good defense, so he did not want to agree to a plea with 20-30 years imprisonment.  But then, according to Vallodolid, the other gang members' attorneys told them not to sign such an affidavit since they had their own cases pending.  According to Vallodolid, their defense strategy changed at this point in time (after the government notice).  He testified the only thing they discussed at that point was trying to beat the murder enhancement at trial.  Everyone seemed to understand that if Vallodolid was found guilty of the murder, that would drive his sentence.

True to its word, on July 17, 2017, the government filed a supplemental notice of enhanced sentencing, alleging Vallodolid "knowingly and intentionally" killed Victor Lusinski, and stating it would seek the aggravating circumstance of intentionally killing a victim while committing criminal gang activity. [Hrg, Def. Ex. L.]

On November 2, 2017, Vallodolid wrote Vanzant a letter saying "I just want to say thank you for your visit this past week and I really appreciate your time and patience with me." [Hrg, Ex. M, at 1.]  He went on to say "I remember you telling me that the government told you that if I keep pushing for trial then they will try and throw more charges against me." [*Id.* at 1-2.] Vallodolid said if Vanzant could get a plea deal without the murder enhancement then he would sign it. [*Id.* at 2.]

On November 20, 2017, Vanzant wrote back advising Vallodolid of the fourth superseding indictment, and stating: "I understand your concerns about continuing toward trial.  As we've discussed, it will be an uphill battle no matter what we do, so whether to plead or proceed to trial is ultimately your call.  My advice at this point is to think about it between now and December 6th and then let me know at the arraignment whether you would still like me to approach the Government about a plea deal." [Hrg, Def. Ex. N.]  Vallodolid then sent another letter to Vanzant thanking him for printing discovery materials out for him and reiterating that if the prosecutor would drop the murder enhancement, then he would sign the plea deal. [Hrg, Def. Ex. O.]

The government then offered one last plea agreement. [Hrg, Def. Ex. R.]  This contained a 360 month binding sentencing cap, an agreement that the members of the RICO conspiracy possessed with the intent to distribute and distributed between 5-15 kilograms of cocaine, and an agreement that the determination of whether Vallodolid would be held  accountable for the murder would be left to the Court at sentencing. [*Id.* at 5.]  Vallodolid testified at the hearing that he still thought there was no downside to

going to trial.  He also thought he would get no more than 30 years in jail, he believed being judged by 12 people instead of 1 judge was better, and because there were some witnesses saying the person who shot Lusinski was black, he thought he would beat the murder charge and get only 20 years imprisonment.  With all plea agreements being rejected by Vallodolid, the matter thereafter proceeded to trial.

Of course in hindsight, Vallodolid wishes he would have taken this last plea deal. But, as was memorialized in an e-mail from Vanzant to co-counsel Bedi, he "[c]onfirmed with darrick on the phone just now that he still wants to proceed to trial and does not want to accept the Gov's last offer." [Hrg, Def. Ex. S.]

During cross examination at the hearing Vallodolid admitted that he generally knew that defendants who plead guilty and cooperate typically do the best at sentencing.  And people who plead guilty generally fare better than those people who decide to go to trial and are found guilty. Vallodolid was 26 years old at the time of trial. So while he was a relatively young man, he was definitely a grown adult at the time he was evaluating and making the decision to plead guilty or not.  He also conceded that he understood that when his attorneys showed him charts of the average sentences handed down that year for similar offenses, half of the sentences fell below that number and half above—there were no guarantees of what his sentence would be if he was found guilty by a jury.  Indeed, per usual, during his initial appearance, Vallodolid was advised that life imprisonment was the maximum possible penalty for his offenses.

Attorney Jonathan Bedi testified at the hearing.  He attended Loyola University, got his law degree from American University, and has been practicing for about 20 years.  Bedi is a highly experienced criminal defense attorney in both the state and federal systems.  He was a Cook County public defender for about nine years, and then started his firm with a colleague in about the end of 2016.  Bedi estimates he has handled thousands of criminal cases during his career and took numerous cases to trial in federal court.  Vallodolid's case happened to be the first case he handled in the Northern District of Indiana, but he had handled drug conspiracies before.  He stated that he was comfortable in calculating and arguing sentencing guidelines.  Bedi was second chair in this case and got involved the summer before it went to trial.  Vanzant reached out to him because he thought the case was headed to trial and wanted some help.  (I approved the appointment of a second lawyer under the Criminal Justice Act given the gravity of the offense and potential penalty.)

This was the first case the two of them had tried together.  Bedi remembers meeting with the government twice for a reverse proffer—a process by which the government explained the evidence they had against Vallodolid.  Bedi testified that they went through each offered plea agreement with Vallodolid.  According to Bedi, as he does in every case, he laid out the pros and cons of each decision, and at the end of the day, it was Vallodolid's decision to accept the plea or not.  He and Vallodolid went back and forth during many conferences discussing possible plea agreements.  According to

Bedi, he thought Valldolid would not be successful on the RICO claim, and he told

Vallodolid that the only fight would really be on the murder charge.

Bedi never pressured Vallodolid to go to trial. Rather, he counseled him with

what the options were and told him they would fight as hard as they could, regardless of

what decision he made. When asked if Bedi understood if Vallodolid was convicted and

the jury found certain drug weights or the murder that he could well get above 30 years,

Bedi answered "absolutely" and stated he, Vallodolid, and Vanzant had conversations

that if Vallodolid was convicted and they found various drug weights or the murder, he

could well get life or a number that would equate to life. Bedi stated he never promised

Vallodolid he would get a certain sentence if he was convicted. Indeed, he testified that

as a rule, he would never promise a client what they would get either after a plea or after

a sentencing. He claims he told Vallodolid that if he went to trial and lost he would get

the maximum, or close to the maximum sentence. When specifically asked whether the

attorneys conveyed to Vallodolid that if he was convicted of everything, he could get life

in prison, Bedi answered "absolutely."

Trial attorney James VanZant also testified at the hearing, and he too is a highly

experienced criminal defense lawyer. He went to DePaul University School of Law after

a career in the Marine Corps. He has handled hundreds of federal cases in his career and

is well versed in the statutory maximums and sentencing guidelines. He reviewed all of

the discovery in this case, had a strong understanding of it, and had multiple

conversations with Valldolid. He explained every plea agreement to him, and he

16

explained the possible outcomes.  Vanzant was specifically aware that if Vallodolid went

to trial and he was found guilty of the murder as an enhancement, that the sentencing

guideline would be life, and he conveyed that to his client.  According to Vanzant,

Vallodolid understood that he was facing a life sentence based on the guidelines.

Vanzant conceded that he did go over some reports with Vallodolid that showed

the average sentencing range, but Vanzant never guaranteed a particular sentence.

According to Vanzant, he gave his best estimate, but never guaranteed a certain sentence

to Vallodolid.  He never promised him a certain sentence and he never guaranteed that if

he was convicted, Vallodolid would not get more than 30 years imprisonment.  Vanzant

never told him to go to trial - rather, they discussed the pros and the cons, but the client

must make the decision to either plead or go to trial.  In this case, Vallodolid was

steadfast in his decision to go to trial.

Remember, in order to establish that counsel's performance was deficient,

Vallodolid must show errors so serious that counsel was not functioning as the

"counsel" guaranteed by the Sixth Amendment.  *Hartjes v. Endicott*, 456 F.3d 786, 790 (7th

Cir. 2006).  And to show prejudice, counsel's conduct must be shown to have "so

undermined the proper functioning of the adversarial process that the trial cannot be

relied on as having produced a just result."  *Cooper v. United States*, 378 F.3d 638, 642 (7th

Cir. 2004).

The Sixth Amendment right to effective counsel "extends to the plea-bargaining

process."  *Lafler v. Cooper*, 566 U.S.156, 162 (2012).  In that context, "a reasonably

competent lawyer must attempt to learn all of the relevant facts of the case, make an estimate of the likely sentence, and communicate the results of that analysis to the client before allowing the client to plead guilty." *Brock-Miller v. United States*, 887 F.3d 298, 308 (7th Cir. 2018). There is no doubt that "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992). But giving an inaccurate prediction of a sentence may not necessarily constitute deficient performance, depending on the gravity of the inaccuracy. *United States v. Cieslowski*, 410 F.3d 353, 359 (7th Cir. 2005).

The Supreme Court has held that an attorney who fails to make a meaningful attempt to inform his client of an existing written plea offer, *see Missouri v. Frye*, 566 U.S. 134, 144 (2012), or advises his client to reject a highly favorable plea offer "on the grounds [the client] could not be convicted at trial," *Lafler*, 566 U.S. at 163, has performed deficiently under the Sixth Amendment. But Vallodolid makes no such claims. And it is clear from the testimony and exhibits adduced at the hearing that his attorneys did inform him of all plea offers and never told him he would not be convicted at trial.

So let's turn to what Vallodolid needs to establish regarding his narrow claim that his counsel's advice just wasn't good enough during the plea negotiations. In order to prove Strickland's prejudice prong, Vallodolid basically has to establish a reasonable probability he would have accepted a plea offer but for the incompetent advice of his attorneys. *Day v. United States*, 962 F.3d 987, 992-94 (7th Cir. 2020). As set out by the

18

Seventh Circuit, "[the petitioner] must prove two things: (1) it is reasonably probable that but for the incompetent advice of his attorneys, he would have accepted the government's renewed plea offer and pleaded guilty; and (2) it is reasonably probable that the judge would have imposed a lower sentence." *Id*. at 992.

The rub here is the first part of the test: Vallodolid never testified his attorneys *advised him* to reject the plea offers and based upon the evidence adduced during the trial, I don't think counsel's advice was incompetent. Vallodolid's own written words at the time show that he was properly advised of the facts, but did not want to accept the multiple settlement offers because he wanted more favorable plea agreement terms. Vallodolid basically claims his attorneys never told him that if he lost at trial he would get life imprisonment. Vallodolid claims he believed he could get no more than 30 years if he was convicted at trial, so when he was offered a plea agreement with the same penalty, he instead chose to roll the dice and go to trial. But a defendant's self-serving testimony that he would have made a different decision with accurate advice need not be accepted at face value by the Court. *See Bethel v. United States*, 458 F.3d 711, 718 (7th Cir. 2006) (observing that "[w]e have stated many times that a mere allegation by the defendant" that he would have proceeded differently with accurate advice "is not sufficient to establish prejudice").

Vallodolid's assertions are flatly contradicted by Bedi and Vanzant's hearing testimony, both of whom I found to be credible. Bedi testified Vallodolid understood if he was convicted and the jury found certain drug weights or the murder, that he could

19

well get above 30 years. According to Bedi, he, Vallodolid, and Vanzant had conversations that if Vallodolid was convicted and they found various drug weights or the murder, he could well get life or a number that would equate to life. Bedi stated he never promised Vallodolid he would get a certain sentence if he was convicted; this would have been contrary to his practice over the past twenty years of representing criminal defendants. When specifically asked whether the attorneys conveyed to Vallodolid that if he was convicted of everything, he could get life in prison, Bedi answered "absolutely."

Mr. Vanzant's testimony corroborates Mr. Bedi's. According to Vanzant, Vallodolid understood he was facing a life sentence based on the guidelines. Vanzant stated he never guaranteed a certain sentence to Vallodolid and never guaranteed that if he was convicted, Vallodolid would not get more than 30 years imprisonment. Vanzant never told Vallodolid to go to trial - rather, they discussed the pros and the cons, and Vallodolid made the decision. This is not ineffective assistance. To the contrary, Vallodolid's attorneys knew the facts of the case, had numerous meetings and discussions with their client based upon the different iterations of the plea agreement, laid out the possible sentences, and properly let their client choose whether to plead guilty or proceed to trial. There is nothing about this representation that falls below an objective standard of reasonableness. His counsel made a good faith effort to apprise him of his options in the case, and Vallodolid understood the offered pleas but was

trying to get a better deal.  That decision was his alone, and cannot now be blamed on his attorneys.

One last thing.  Vallodolid's newly appointed counsel spent a lot of time at the hearing discussing charts that Vanzant showed Vallodolid concerning the average and median sentences for the applicable guidelines that year. [Hrg., Def. Ex. B, Ex. D.]  While it is true these numbers might have been somewhat misleading since they were based on a relatively small number of cases and also included defendants who pleaded guilty, Vallodolid admitted during the hearing that he understood that when his attorneys showed him charts showing the average sentence that year that half of the sentences fell below that number and half above, and there were no guarantees of what his sentence would be if he was found guilty by a jury.

### B.     Failure to Investigate

Vallodolid also claims his counsel was ineffective for not investigating certain aspects of the case - he specifically faults the failure to locate and call a person named Vasquez as a witness, who he believes could have shown that testifying witnesses Joshua Roberts and Keith Manual provided "self-serving" and unreliable testimony. [DE 3253 at 5-6, 15.]

A section 2255 petitioner alleged ineffective assistance of counsel due to counsel's failure to investigate has the "burden of providing . . . a comprehensive showing as to what the investigation would have produced."  *Hardamon v. United States*, 319 F.3d 943, 951 (7th Cir. 2003); *see also United States v. Hubbard*, 929 F.2d 307, 310-311 (7th Cir. 1991).

21

A petitioner who merely speculates does not carry his burden. *See Long v. United States*, 847 F.3d 916, 922 (7th Cir. 2017) (no relief under section 2255 where "although [the petitioner] faulted [trial counsel] for failing to investigate, he never allege[d] what the investigation would have produced.'"). "Without identifying what evidence an investigation would have uncovered, [a petitioner] cannot show that his attorney's failure to conduct an investigation was objectively unreasonable." *Kratz v. United States*, 79 F. App'x 932, 934 (7th Cir. 2003).

Vallodolid's failure to investigate claim focuses on two witnesses—Latin Kings Josh Roberts and Keith Manual. Roberts testified that he received a call from Vallodolid on the day of the murder, stating Vallodolid left an object in Roberts' car in between the seat and driver's door. [Tr. 871-73, 1576, 2571-72.] Roberts looked in that spot and found a revolver, which may have been a .22 caliber. [Tr. 873, 899.] At Vallodolid's request, Roberts removed the rubber bands from the revolver's handle and flushed them down the toilet, then hid the firearm in his basement crawlspace until Vallodolid returned later that evening to pick up the gun. [Tr. 886-91.] A few days later, fellow gang member Vasquez and Vallodolid told Roberts that Vallodolid had shot a kid off a bike whose hat pointed in the wrong direction (signifying a rival gang membership), and Roberts understood this to mean the Lusinski murder. [Tr. 892-97, 895, 921-22.] When Vasquez told Vallodolid he should have fought the kid instead of shooting him, Vallodolid's response was something to the effect of, "we're Latin Kings; this is our neighborhood. We are not going to let nobody come over here" and Roberts testified that Vallodolid

said, "[w]hy would I fight him if I have a gun?"  [Tr. 892-97, 894, 897, 927-28.]  After the

murder, Vallodolid started calling himself and going by the nickname "Deuce" or

"Deuce Deuce," which Roberts understood to mean twenty-two, as in .22 caliber.  [Tr.

603, 898-900, 929, 1390.]

For his part, Latin King Keith Manuel testified that when he was released from

prison in 2010, Vasquez and another King bragged to him about how Vallodolid was

protecting his neighborhood and shot at a rival Two-Six gang member on a bike.  [Tr.

1387-88.]  Vallodolid himself told Manuel that he shot a Two-Six on a bike with his hat

turned the wrong direction, and then took the gun to Roberts' house after the murder.

[Tr. 1390-95, 1568-70.]  Trial Exhibits 14A and 14B are photos taken the same day of the

conversation showing Manuel and Roberts holding a .22 revolver and posing with

Vallodolid.  [Ex. 14A-B; Tr. 1391-93.]  Vallodolid stated that he should have been the one

holding the .22 revolver because his nickname is "Deuce," the .22 caliber is his specialty,

and he talked about the day he shot the Two-Six off the bike, including that there were

no shell casings (meaning a revolver was used).  [Tr. 1391-95, 1569-70.]  Manuel spent a

lot of time with Vallodolid as a King, and Vallodolid told Manuel about committing the

murder on a number of occasions.  [Tr. 1557.]

Vallodolid says a better investigation would have led to witness Vasquez who

would have made a difference at trial by calling into question Roberts and Manual's

testimony.  But the argument fails for a lack of specificity—Vallodolid provides no

details of the facts Vasquez would have testified to, even if his attorneys were able to locate him.

Vallodolid also blames counsel for not seeking out an expert "to testify about how an individual's visual perspective can alter their recollection as to what transpired at a specific moment in time." [DE 3253 at 15.]   Again, this accusation is vague and speculative, and "the absence of a defense expert . . . is not sufficient to establish that counsel's performance was deficient." *Ellison v. Acevedo*, 593 F.3d 625, 634 (7th Cir. 2010).

Finally, Vallodolid criticizes his attorneys for their investigation of the existence of a crawl space in a house.  [DE 3253 at 4-5.]  Recall that Roberts testified at trial that, at Vallodolid's request, a firearm had been placed in the crawl space of Vallodolid's residence located at 1231 Indiana Street.  Vallodolid claims that before trial, he told his counsel that based on his memory, that house did not have a crawl space. [DE 3253 at 5.] Vallodolid believes his counsel sent a private investigator to the residence to determine if a crawl space existed, but the occupant would not allow him entry.  *Id.*  Counsel then pulled the city property records, and concluded that Vallodolid's recollection was correct.  *Id.*  Vallodolid claims the parties entered into a stipulation that no crawl space existed at the Indiana Ave. house, but he faults his counsel for opening the door about his statement as to its existence, and "allowed the United States to argue in summation that a crawl space actually did exist and even show the jury photographs of the purported crawl space with Roberts standing next to it." *Id.*

This argument is confounding.  Obviously Vallodolid's counsel had sufficient performance by attempting to investigate the house itself, and then going so far as to pull the city property records to determine if a crawl space actually existed in that house. Plus Vallodolid does not explain how the existence of a crawl space could possibly prejudice the outcome of the trial.

### C.    Failure to Retain a Toxicology Expert

Vallodolid also argues his counsel was ineffective for not retaining a toxicology expert. [DE 3302-1 at 4.]  Specifically, he argues that the expert could have testified about the methadone taken by Joshua Roberts during the same day of his trial testimony, and Xanax taken by Keith Manual, and whether these drugs "diminished their ability to give testimony and/or whether the drugs and medication caused any abnormal mental conditions or memory los[s]." *Id.*

Roberts testified at trial that he had abused Xanax, Norcos, and Vicodin, and he was currently taking methadone, but to his knowledge the drugs didn't affect his memory that much and he "still pretty much ha[d] a good memory." [Tr. 853-54.]  Trial counsel had ample time to cross examine this witness, and indeed asked him a number of questions about his cooperation.  [Tr. 906-922.] Additionally, Vallodolid's counsel specifically questioned Roberts about his drug usage.  For example, he asked, "you were doing a lot of drugs on April 12, 2009, when you supposedly met Darrick, right?" and "You don't recall because you have done a lot of drugs, right?" and "it has affected your

memory, hasn't it?" [*Id.* 923.] Vallodolid has not shown that it was below an objective standard of reasonableness not to hire a toxicology expert, or any resulting prejudice.

As for Keith Manuel, he also testified that he used Xanax on and off, for a few months at a time. [Tr. 1668.] Counsel's cross examination spans over 100 transcript pages [Tr. 1483-1618] and it was very extensive. The jury was able to determine the credibility of Manuel's testimony by listening to his answers, and watching his body language. Determinations of witness credibility are entitled to great deference, and is the job of the fact finder. *United States v. Blalock*, 321 F.3d 686, 690 (7th Cir. 2003).

In sum, Vallodolid has not stated how hiring an expert on toxicology would have changed the result of the jury trial. *See Silva v. United States*, 75 F.Supp.2d 877, 882-83 (N.D. Ill. 1999); *see also Williams v. Anderson*, 174 F.Supp.2d 843, 869 (N.D. Ind. 2001) (upholding Indiana Supreme Court's determination of not finding ineffective assistance of counsel where the petitioner had not shown how his counsel's failure to hire a blood spatter expert prejudiced his trial or sentence).

### D.     Failure to Object

Vallodolid claims his counsel was ineffective when they failed to make "obvious and meritorious objection[s] to tainted evidence" including the testimony of "compensated, interested, biased witnesses, whose own eventual freedom depended on their ability to obtain Vallodolid's conviction." [DE 3302-1 at 7.] He made this same argument in his motion for acquittal, which I rejected. [DE 1986 at 7-9.]

26

It is the jury's job to consider the witnesses' motives and credibility, and it is their purview to review the credibility of a witness testifying pursuant to a plea agreement, with a criminal background, and with attending possible biases. *United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir. 1992); *see also United States v. Jackson*, 935 F.2d 832, 843 (7th Cir. 1991) (jury considers a witness' checkered past and biases and decides he is credible if it chooses to convict). All of these witnesses were cross examined at trial and all of these potential deficiencies in their testimony were brought out. It was up to the jury to sift through the evidence and determine how much weight to give their testimony. To assist them in that process, the jury was instructed about inconsistent statements, how to evaluate the testimony of the witnesses who were promised certain benefits in return for their testimony and cooperation with the government, that Manuel was convicted of providing false information to a law enforcement officer, and that Sanchez, Manuel, Cancel, Brown, Alcaraz, Diaz, and Perez pled guilty to one or more of the crimes that Vallodolid was charged with committing. [DE 1948, at 12-13.] The jury was instructed to treat the testimony from these fellow gang members "with caution and great care." [*Id.* at 13.]

Vallodolid questions the reliability of compensated witnesses. [DE 3302-1 at 7-11.] But again, the jury was well aware of the cooperation of certain witnesses and any benefits they might have been offered, and this was fodder for cross examination, as well as specifically instructed to the jury.

Vallodolid has not pointed to any specific objections his counsel should have voiced, and his general qualms with the testimony of the trial witnesses does nothing to show that his counsel had deficient performance. There was plainly a basis for these fact witnesses to testify, and trial counsel's performance cannot be deficient by failing to make a futile objection. *Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015) (performance not deficient for failure "to make a futile objection"); *United States v. Neeley*, 189 F.3d 670, 684 (7th Cir. 1999) ("Obviously, counsel can not be considered ineffective for failing to make an objection to the introduction of evidence that was properly admitted.").

### E.    Failure to File Suppression Motion

Vallodolid claims his attorneys were ineffective by failing to file a pretrial motion to suppress the out of court identification of Vallodolid by government witness Joshua Roberts. [DE 3302-1 at 15-16.] If an ineffective assistance of counsel claim is premised on an attorney's failure to file a motion to suppress, the defendant must prove that the motion would have been meritorious. *See United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005); *Long v. United States*, 847 F.3d 916, 920-21 (7th Cir. 2017). Vallodolid completely fails in this regard, only making the conclusory statements that Robert's identification of his voice on the telephone was more prejudicial than probative, and generally arguing that out of court identifications are unreliable. Because he has not shown it would have been a winning motion to suppress, it was not effective for his counsel to fail to file it.

28

F.    **Ineffective Counsel Claims for Sentencing Phase**

Vallodolid also claims that his counsel was ineffective during the sentencing phase for failing to challenge the constitutionality of the life sentence as to Count 1, based upon an alleged misapplication of Indiana law. [DE 3245 at 7.] As discussed earlier in this opinion, this argument was rejected by the Seventh Circuit [DE 3004-1 at 20-22], therefore it cannot be deficient performance to raise a meritless argument during sentencing.

## Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings, a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability may issue only if the applicant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a defendant must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 475 (U.S. 2000) (internal quotation marks and citation omitted).

For the reasons set forth above, Vallodolid has not stated any grounds for relief under section 2255. The Court finds no basis for a determination that reasonable jurists would find this decision debatable or incorrect or that the issues deserve encouragement to proceed further. Therefore, a certificate of appealability will not be issued. 28 U.S.C. §

29

2253(c)(2); *Welch v. United States*, 136 S. Ct. 1257, 1263-64 (2016).  If Vallodolid wishes to appeal this Opinion and Order, he must seek a certificate of appealability from the Court of Appeals under Federal Rule of Appellate Procedure Rule 22.

**Conclusion**

For the foregoing reasons, Vallodolid's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [DE 3245] is **DENIED**, and a certificate of appealability is also **DENIED**.  The Clerk shall enter judgment against Vallodolid and in favor of the United States in the civil case opened on the § 2255, Cause No. 2:23-cv-376.

SO ORDERED.

ENTERED: February 23, 2026.

/s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**